UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

DAVID BANFORD,                    :
ROBERT MILLER,                    :
GARY STRATTON, and                :
SCOTT MCGRATTY                    :
                                 :        Case No. 2:12-cv-131
          Plaintiffs,            :
                                 :
     v.                          :
                                 :
ENTERGY NUCLEAR                   :
OPERATIONS, INC.                  :
                                 :
          Defendant.             :

## Opinion and Order

Plaintiffs David Banford, Robert Miller, Gary Stratton and
Scott McGratty brought this suit against Defendant Entergy
Nuclear Operations, Inc. ("Entergy").  The Plaintiffs challenged
their designation as exempt employees for purposes of overtime
pay under the Fair Labor Standards Act ("FLSA" or "the Act") and
a related state statute.  After a four-day trial, the jury found
that 1) Entergy had misclassified each Plaintiff as exempt, 2)
Entergy's misclassification was willful, and 3) there was not an
understanding between Entergy and each of the Plaintiffs that
their salaries would cover all hours in the workweek above and
below forty hours.

The parties have filed post-trial motions.  Plaintiffs move
for a judgment order incorporating the jury verdict.  ECF No.

195.  Entergy renews its motion for judgment as a matter of law
or, in the alternative, moves for a new trial.  ECF Nos. 198,
201.

For the reasons described in detail below, the Court **grants**
Entergy's motion for judgment as a matter of law on the
fluctuating workweek issue with respect to Plaintiffs Miller and
Stratton only.  The Court **denies** Entergy's motion for judgment
as matter of law in all other respects and **denies** Entergy's
motion for a new trial.  Accordingly, the Court **denies**
Plaintiffs' motion with respect to Plaintiffs Miller and
Stratton on the fluctuating workweek issue only.  The Court
**grants** Plaintiffs' motion for judgment incorporating the jury
verdict in every other respect.

## I.   Relevant Background

Vermont Yankee Nuclear Power Plant ("Vermont Yankee") is
operated by Entergy.  The plant previously relied on The
Wackenhut Corporation ("Wackenhut") to provide independent
security services.  In around 2009, Vermont Yankee brought its
security staff in house.  The Plaintiffs were previously
employed by Wackenhut, and some performed functions while
Wackenhut employees similar to those they perform now that they
are employed by Entergy.  Wackenhut classified its employees in
similar roles as non-exempt and they received time-and-a-half
for overtime.

The Plaintiffs are four Security Shift Supervisors ("SSS") at Vermont Yankee.  Five SSS's work with a minimum of four Security Officers ("SO") and together the SO's and SSS's comprise a security "shift."  All the SSS's and SO's wear a uniform and carry the same weaponry during the shift.  Each shift works for twelve hours at a time, either days or nights. The shift is responsible for round-the-clock security at Vermont Yankee.  The SO's are the lowest rung of the security hierarchy and the SSS's are one level above the SO's.  The SSS's are supervised by Security Operations Supervisors ("SOS").  The SO's are members of a union but the SSS's and SOS's are not.

SSS's usually work four twelve-hour days in a row followed by four days off.  This means that some weeks they work for at least forty-eight hours and some they work less than forty. This four on/four off schedule was the same schedule that Wackenhut used.  During their four days on, SSS's divide their time between four roles: Central Alarm System ("CAS") Operator, Secondary Alarm System ("SAS") Operator, Field Support Supervisor (FSS), and Lead Shift Supervisor (LSS).  While in the CAS/SAS role SSS's use computers and video monitors to observe activity in the plant.  SAS is essentially duplicative of CAS and operates as redundant backstop.  The FSS has a variety of duties that include making rounds and checking on the SO's for alertness.  The FSS must also be ready to respond to a

contingency.  Finally, the LSS is the lead SSS for the day and oversees the shift while also performing a variety of clerical duties.  During a four-day period SSS's spend one day in the LSS role.  On the other three days they rotate between CAS, SAS, and FSS.

Vermont Yankee leadership developed a Security Plan, which is a set of procedures that have been designed to address the different types of scenarios that might lead to an armed intrusion or attack, often referred to as a contingency event. Procedure 0904 is a document that implements aspects of the Vermont Yankee Security Plan.  The Security Plan and Procedure 0904 could not be introduced into evidence or discussed with specificity during the trial because they both contain what is referred to as safeguards information or SGI.  SGI is any information that federal law prohibits disclosing that relates to security issues at nuclear power plants.  *See* 42 U.S.C. § 2167.

Vermont Yankee is now in the process of being decommissioned, which means that there will be an accompanying reduction in force.  In other words, many individuals will no longer have jobs as the security needs of the plant change.

Entergy has classified the SSS's as exempt employees.  They are paid a fixed salary and do not receive any extra pay if they work more than forty hours in a week.  However, SSS's are

4

eligible to participate in the Management Incentive Program ("MIP"), through which they earn yearly bonuses that depend on a variety of factors.

The parties stipulated to the number of overtime hours the Plaintiffs worked as well as each Plaintiff's respective weekly salary.  Based on the jury's verdict and the parties' stipulation, the Plaintiffs have calculated their damages to total $535,406.35, which includes liquidated damages.

## II.  Entergy's Motion for Judgment as a Matter of Law

### A.  Legal Standard

Entergy renews its mid-trial motion for judgment as a matter of law under Federal Rule of Civil Procedure 50.  To succeed on a Rule 50 motion, the moving party must show that, after a full hearing on an issue at trial, "there is no legally sufficient evidentiary basis for a reasonable jury to resolve the issue in favor of the non-moving party."  *Cross v. New York City Transit Authority*, 417 F.3d 241, 247 (2d Cir. 2005) (internal quotation omitted).  In reviewing a Rule 50 motion, a court must "'draw all reasonable inferences in favor of the nonmoving party'" and "'may not make credibility determinations or weigh the evidence.'"  *Id.* (quoting *Reeves. v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)).

A movant's burden in securing Rule 50 relief is "particularly heavy" after a jury has deliberated and returned

its verdict.  *Id.* at 248.  A Rule 50 motion must be denied unless "'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'"  *Id.* (quoting *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir. 1993)).  In other words the court may only grant a Rule 50 motion in this posture if there is "'such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise or conjecture, or . . . [there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men [and women] could not arrive at a verdict against him.'"  *Id.* (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992)).

Judgment as a matter of law on an issue as to which the movant bears the burden of proof is "rare."  *Broadnax v. City of New Haven*, 415 F.3d 265, 270 (2d Cir. 2005) (internal quotation omitted).

**B. Discussion**

Entergy raises several arguments as to why the jury's verdict should be set aside and the Court should enter judgment as a matter of law in its favor.  The Court addresses each argument with Entergy's "particularly heavy" burden in mind.  *Cross*, 417 F.3d at 248.

### 1.  Fluctuating Workweek

Plaintiffs filed a pre-trial motion *in limine* that sought to preclude the use of the fluctuating workweek ("FWW") method for determining damages.  The Court addressed the propriety of the FWW method after the parties submitted their proposed jury instructions.  The Court held that applying the FWW method in a mischaracterization case is appropriate only if the jury makes certain factual findings or the parties stipulate to those facts.  ECF No. 179 at 2-3.  The parties stipulated to some of these factual predicates, so the only issue for the jury was to determine the nature of the agreement between the parties.  Specifically the jury was asked "whether Entergy and the Plaintiff agreed that the Plaintiff's salary would cover all hours in the workweek above and below 40 hours."  ECF No. 182 (jury verdict form).  The jurors were instructed that in determining the nature of the employment agreement that they "must consider whether the Plaintiffs knew that their hours would fluctuate and whether the Plaintiffs agreed that their fixed salary would cover all the hours they worked."  ECF No. 181 at 21 (jury charge); *see also* ECF No. 179 at 17 (FWW opinion).

Applying the FWW method is appropriate if it is clear that the Plaintiffs' overtime premiums would have been calculated using the FWW method if the Plaintiffs had been properly

7

characterized.  There is no dispute that Entergy intended that each Plaintiff's salary would cover all hours worked regardless of their number.  Mr. Patrick testified that he was involved in hiring the Plaintiffs.  ECF No. 191, 167:14-16.  He stated that the SSS's would receive the same pay regardless of whether they worked more or less than forty hours in a week, even if they took a sick day or a vacation day.  ECF No. 191, 163:12-164:6. He also testified that Entergy would not dock an employee's pay if he were to miss a scheduled day of work but did not have any leave time remaining.  ECF No. 191, 164:13-16.  Finally, Mr. Patrick testified that he uses standard language when interviewing all candidates for SSS positions.  ECF No. 191, 167:25-168:2.  He claimed that he tells candidates that the SSS job is a salaried position but certain circumstances may require them to work an extra shift without reimbursement.  ECF No. 191, 168:2-11.

There is no evidence in the record that undermines this summary of Entergy's side of the understanding.  The Court's analysis, therefore, depends on evaluating each Plaintiff's state of mind.  Without a clear understanding on *both* sides, there can be no meeting of the minds required to apply the FWW method as a matter of law.

As the jury was instructed, and consistent with its FWW opinion, ECF No. 179 at 17, the Court must consider whether the

Plaintiffs knew that their hours would fluctuate and whether they agreed that their fixed salary would cover all the hours they worked.  The Court finds that there is no legally sufficient evidentiary basis for a reasonable jury to resolve these questions in favor of Mr. Miller or Mr. Stratton.  Neither Mr. Miller nor Mr. Stratton offered live testimony at trial. The Plaintiffs simply did not present any evidence with respect to Mr. Miller and Mr. Stratton's respective states of mind.[1] Entergy, on the other hand, submitted excerpts of each Plaintiff's deposition testimony that were read to the jury during its case.  The only evidence regarding Mr. Stratton's understanding of his hours and compensation was an acknowledgement that he would be receiving a salary and a bonus. ECF No. 191, 57:22-58:3.  Mr. Miller's only testimony was that he knew that he would no longer be in the union and that he would be getting a fixed biweekly amount of pay.  ECF No. 191, 61:12-24.  This suggests that they both knew that their salary was fixed.  There is simply no testimony from either Mr. Miller or Mr. Stratton that rebuts Mr. Patrick's testimony that he gave them the standard "spiel" when they were hired informing them that they would receive a salary and would not be reimbursed for

---

[1] Mr. Banford testified that he observed Mr. Stratton and Mr. Miller perform their job duties and that the duties he described accurately reflected what they do as well.  ECF No. 189, 183:24-184:11.  This testimony, however, does not establish their respective states of mind.

an extra shift.  ECF No. 191, 167:25-168:11.  It was therefore
unreasonable for the jury to conclude Mr. Miller and Mr.
Stratton did not understand that their salary would cover all
the hours that they worked because the Plaintiffs presented no
evidence to the contrary.  Applying the FWW method to calculate
their damages is appropriate.

Accordingly the Court will enter judgment as a matter of
law on this issue with respect to Mr. Miller and Mr. Stratton.
This decision only affects the amount of their damages.  The
Court will require the parties to recalculate Mr. Miller's and
Mr. Stratton's damages using the FWW method.

Mr. Banford and Mr. McGratty present a somewhat more
complicated case.  Some evidence suggests that Mr. Banford and
Mr. McGratty knew that their hours would fluctuate above and
below forty hours and that they would be receiving a steady
salary no matter how many hours they worked.  *See* ECF No. 189,
198:9-18; ECF No. 190, 58:15-16, 61:7-8.  However, the evidence
is not clear as to whether Mr. Banford and Mr. McGratty agreed
that their fixed salary would cover all the hours they worked
*regardless* of their number.  Mr. Banford testified that he
thought that if he worked a day of overtime he could take
another day off within that time period "as a kind of comp
time."  ECF No. 189, 177:9-13.  This suggests he thought he
might be compensated in some way if he worked an extra day

during the shift when he was not scheduled to work.  A reasonable jury could also have inferred that his expectations were simply not on the same page as Entergy's when he testified, that he was "sold a false bill of goods." *Id.* 177:13.

Likewise, a reasonable jury could have inferred that Mr. McGratty did not agree that his salary would cover all the hours he worked regardless of their number.  Mr. McGratty testified that there was no discussion as to whether his salary would cover overtime hours and he had no understanding about overtime when he was hired.  ECF No. 190, 58:17-19, 58:24-59:1.  Mr. McGratty also stated that if his leave time was exhausted and he did not come to work that his pay would be docked.  ECF No. 190, 88:7-12.[2]  This suggests that he thought he might receive less than his usual salary under some circumstances.

The parties stipulated to the number of hours the Plaintiffs worked and the amount that they were paid each week. Entergy argues that because Plaintiffs were consistently paid the same amount but their hours fluctuated from week to week that this is sufficient to find an "implied understanding

---

[2] This belief was supported to some degree by testimony from Mr. Spitzfaden.  Mr. Spitzfaden, in a portion of his deposition that was read to the jury, stated that he also thought that Entergy would probably deduct pay from someone who had used up all of their accrued leave and then worked less than forty hours in a week.  ECF No. 191, 157:25-159:17.  Mr. Spitzfaden then clarified that he would have to check with Entergy's legal department.

established by this course of conduct" as a matter of law.  ECF
No. 200 at 5.  The Court agrees that it is appropriate for
factfinders to consider implicit factors when evaluating whether
there was a meeting of the minds, but simply demonstrating a
fixed salary and variable hours is insufficient, standing alone,
to prove each Plaintiff knew and agreed that his salary would
cover all hours worked as a matter of law.  Mr. Banford's and
Mr. McGratty's testimony about their respective states of mind
was sufficient for a reasonable jury to conclude there was no
meeting of the minds between Entergy and these two Plaintiffs.[3]
A reasonable jury could have found that even if both generally

---

[3] The cases Entergy cites to support its argument that an implied
understanding existed between the parties are largely
distinguishable or have already been rejected by the Court as
inapplicable in its FWW opinion.  In *Urnikis-Negro v. Am. Family
Prop. Services*, 616 F.3d 665, 667 (7th Cir. 2010) and *Ransom v.
M. Patel Enterprises, Inc.*, 734 F.3d 377, 382 (5th Cir. 2013)
both courts credited testimony suggesting the agreement was
explicit rather than implicit.  In both *Rushing v. Shelby County
Government*, 8 F. Supp. 2d 737 (W.D. Tenn. 1997) and *Zoltek v.
Safelite Glass Corp.*, 884 F. Supp. 283 (N.D. Ill. 1995) the
district courts found that the undisputed facts demonstrated
that employees had impliedly consented to be paid at a fixed sum
regardless of the hours worked.  Here testimony from Mr. Banford
and Mr. McGratty contradicts the notion of an implied
understanding because it suggests that their understanding was
different from Entergy's.  These two cases are not sufficient to
persuade the Court that there was an implicit agreement in this
case as a matter of law.  Finally, the Court has already
rejected the applicability of *Valerio v. Putnam Associates,
Inc.*, 173 F.3d 35 (1st Cir. 1999).  *See* ECF No. 179 at 13 n.3.
The U.S. DOL Opinion Letter 2009-3 relies on *Valerio* to support
its reasoning.

knew their hours might fluctuate, neither understood that his
salary would cover all the hours he worked regardless of their
number.  Therefore, judgment as a matter of law on this issue is
warranted, but only with respect to Mr. Miller and Mr. Stratton.

### 2.  Willfulness

A violation is "willful" within the meaning of 29 U.S.C. §
255(a) if "the employer either knew or showed reckless disregard
for the matter of whether its conduct was prohibited by the
statute." *Parada v. Banco Industrial De Venezuela, C.A.*, 753
F.3d 62, 71 (2d Cir. 2014) (internal quotation omitted).  If an
employer acts unreasonably but not recklessly, its action should
not be considered willful.  *Id.*  Moreover, merely negligent
conduct is not willful.  *McLaughlin v. Richland Shoe Co.*, 486
U.S. 128, 133 (1988).  The Plaintiff bears the burden of proof
on the issue of willfulness.  *Parada*, 753 F.3d at 71.

A reasonable jury could have concluded that Entergy's
mischaracterization of the Plaintiffs as non-exempt was willful.
There is no evidence in the record suggesting that Entergy knew
its classification of the SSS's was prohibited by the FLSA.
However, there was sufficient evidence to support a finding that
Entergy showed a reckless disregard as to whether its conduct
was prohibited by the FLSA.  This finding is supported by three
categories of evidence.

13

First, during the transition from Wackenhut to in-house security, Entergy conducted no analysis as to whether or not certain employees' move from a non-salaried, non-exempt status to salaried, exempt status was appropriate. Mr. Banford testified that he had reason to believe that Entergy was aware of how he got paid at Wackenhut because it was "common sense" that since Entergy hired Wackenhut "[t]hey knew the pay structure." ECF No. 189, 176:10-16. Mr. Spitzfaden testified that he was in charge of compliance with the FLSA. ECF No. 191, 153:17-20. He was aware that Entergy started taking security forces from Wackenhut and converting them to in-house security force. ECF No. 191, 153:21-25. However, he was not aware that some employees were moving from non-exempt to exempt categories. ECF No. 191, 154:1-18. Moreover, Mr. Spitzfaden testified that he was not asked to analyze whether a conversion of some of those workers was appropriate under the terms of the FLSA even though he was responsible for oversight. ECF No. 191, 154:19-25. This suggests Entergy was willfully ignorant when it brought its security force in house. This demonstrates recklessness disregard sufficient to support a finding of willfulness.

Next, Mr. Banford's testimony suggested that the Plaintiffs ended up receiving smaller bonuses than they were promised. A jury could have inferred that Entergy acted recklessly with

14

respect to their exemption status in order to pay them less than they might have made if they were properly characterized.  Mr. Banford testified that he was afraid that his salary was too low and that he earned more as an officer.  ECF No. 189, 177:24-178:4.  Mr. Patrick told him that he had never seen a bonus fall below fifteen percent.  ECF No. 189, 178:19-21.  However, Mr. Banford testified that one year the majority of supervisors got between five and seven percent but he received something closer to three percent.  He testified that he also received less than fifteen percent in other years.  ECF No. 189, 178:24-179:2.  Mr. McGratty also testified that he was promised a bonus of fifteen percent during his interview.  ECF No. 190, 58:15-16.

Finally, the jury could have found that Entergy's representations about the nature of the overtime Plaintiffs would be performing were not borne out in practice.  For example, Mr. Banford testified that he applied for the SSS position because he was "told that . . . it would be minimal overtime" but "none of this took place."  ECF No. 189, 177:7-13. The jury also could have considered the charts presenting the total number of hours and numbers of hours over forty each Plaintiff worked.  Defs.' Exs. Y, Z, AA, BB.  These charts reveal that the number of overtime hours fluctuated widely over time and even totaled more than 20 hours in some weeks.  After the first year, there does not appear to be any kind of

15

regularity in the Plaintiffs' schedules with respect to either the number of work hours or overtime hours.  This suggests the understanding that the Plaintiffs' schedule would be consistent did not take place in practice.

This evidence of Entergy's willful ignorance and disingenuousness with respect to its promises to the Plaintiffs could have lead a reasonable jury to conclude that Entergy acted recklessly in classifying the Plaintiffs as exempt.  Therefore, judgment as a matter of law on this issue is not warranted.[4]

### 3.  FLSA Exemptions

Entergy argues that the Plaintiffs in this case were properly classified as exempt because they were covered by the executive exemption, 29 C.F.R. § 541.100, the administrative exemption, 29 C.F.R. § 541.200, or a combination of both, 29 C.F.R. § 541.708.

To demonstrate the executive exemption applied, Entergy had to prove 1) that the Plaintiffs' primary duty was the management of the enterprise in which they were employed or of a

---

[4] The Plaintiffs argue that their overtime claims brought under Vermont law are subject to a six-year statute of limitations pursuant to 21 V.S.A. § 384.  Entergy disputes this.  A willful violation of the FLSA extends the statute of limitations to three years.  29 U.S.C. § 255(a).  In light of the fact that the Court has declined to overturn the jury's willfulness finding as a matter of law, the Court need not decide what the state statute of limitations is because all of the Plaintiffs' claimed damages accrued within three years of the date they filed suit.

customarily recognized department or subdivision thereof, 2) the Plaintiffs customarily and regularly directed the work of two or more other employees, and 3) the Plaintiffs had the authority to hire or fire other employees or their suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees was given particular weight.[5]  29 C.F.R. § 541.100.

To demonstrate the administrative exemption applied, Entergy had to prove 1) the Plaintiffs' primary duty was the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers, and 2) the Plaintiffs' primary duty included the exercise of discretion and independent judgment with respect to matters of significance.[6]  29 C.F.R. § 541.200.

An employer bears the burden of proving that its employees fall within an exempted category.  *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012).

### a. Primary Duty

Both exemptions require the factfinder to consider and decide the nature of the Plaintiffs' primary duty.  An employee's primary duty is the principal, main, major or most

---

[5] The parties stipulated that the Plaintiffs were compensated on a salary basis at a rate not less than $455 per week.

[6] *Id.*

important duty.  Determining what the employee's primary duty is
depends on all the facts of a particular case with the major
emphasis on the character of the employee's job as a whole.  29
C.F.R. § 541.700.

At trial the Plaintiffs argued that their primary duty was
to act as first responders while Entergy argued that the
Plaintiffs' primary duty was either management or administration
or a combination of both.  The parties largely agreed about the
various activities SSS's perform each day.  However, they
presented sharply conflicting evidence about how those
activities should be characterized and understood and which
activity should be viewed as the most important and therefore
primary duty.

The jury did not need to find that the Plaintiffs' primary
duty was to act as first responders in order to find that the
Plaintiffs were not exempt.  Entergy could have failed to carry
its burden of proof even if the jury did not agree with the
Plaintiffs' theory that the SSS's are in fact best understood as
first responders.  The jurors needed only to find that the
Plaintiffs' primary duty was *not* management or administration.
That would have been sufficient to find that the Plaintiffs were
not exempt.  There was a substantial amount of evidence
suggesting that the Plaintiffs' primary duty was something other

than management or administration as defined by the regulations for each of the roles the Plaintiffs perform.

### i.    CAS/SAS

Plaintiffs spend fifty percent of their time in the CAS/SAS role.  The Plaintiffs emphasized that the CAS/SAS function is best characterized as surveillance, and therefore a type of first responder activity.  Several witnesses provided evidence suggesting that this was the case.  For example, Mr. Banford testified that the purpose of watching the monitors is surveillance and that he spent relatively little time tracking or evaluating the SO's.  ECF No. 189, 71:10-12, 77:1-6.  He also testified that he cannot be distracted with other duties because surveillance is the main focus of CAS.  ECF No. 189, 98:25-99:4.

Next, Mr. McGratty testified that CAS/SAS entails doing surveillance from the camera feeds and assessing alarms.  ECF No. 190, 67:13-22.  Mr. Copperthite agreed that to comply with NRC regulations Vermont Yankee has to have a robust surveillance program.  ECF No. 191, 40:11-14.  Mr. Copperthite also testified that a component of CAS/SAS is surveillance.  He even agreed that he previously said one of the *primary duties* of a CAS/SAS Operator is surveillance.  ECF No. 191, 41:9-43:4.  This was a significant admission from a defense witness that the jury could have reasonably credited.

Even Mr. Wilson agreed that surveillance is a component of CAS/SAS although he did not agree that it was a significant one. ECF No. 190, 157:6-18.  Finally, Mr. Parker used the term surveillance in his deposition but refused to use the term at trial because he said he thought it was a legal term with significance.  ECF No. 191, 130:9-24.  When pressed he agreed that what the SSS's do includes surveillance.  ECF No. 191, 131:2-5.  The jury could have found Mr. Parker's testimony that CAS/SAS was not surveillance less credible in light of his deposition.

Entergy emphasized that the CAS/SAS role should be viewed as command and control, and therefore a type of management or administrative activity.  However, based on the evidence described above, a reasonable jury could have found that Plaintiffs spend as much as fifty percent of their time in a role in which their main function is to observe the plant rather than manage other employees.

### ii.   FSS

The Plaintiffs spend twenty-five percent of their time in the FSS role.  They emphasized this role requires the SSS's to be at the ready to act as first responders in the event of a contingency.  Several witness's testimony supported this characterization.  Mr. Banford testified that the primary role of the FSS is to stand by ready to respond to a contingency.

ECF No. 189, 110:9-10.  Mr. LeClaire agreed that in the event of
a contingency that the FSS would respond with Security Officers
and they are armed to use force as needed.  ECF No. 189, 237:3-
12.  Mr. Dagg testified in deposition testimony read to the jury
that the FSS is the first to respond, along with the SO's.  ECF
No. 190, 205:25-206:3.  In other deposition testimony that was
read to the jury, Mr. Copperthite stated that the FSS is ready
to be called into action and to be a first responder just like
anybody else on the security force.  ECF No. 191, 44:14-25.  Mr.
Parker agreed that in the FSS role that he is one of the first
responders.  ECF No. 191, 123:21-124:4.  Mr. Parker also
testified that he is acting as a first responder when going into
the field and directing the work of subordinates.  ECF No. 191,
125:24-126:4.

      Entergy emphasized that the role of the FSS is, like
CAS/SAS, to exercise command and control, or in other words to
manage, in the event of contingency.  A reasonable jury could
have concluded that Plaintiffs spend as much as a quarter of
their time in the field, poised to respond to contingencies
rather than managing other employees.

### iii.   LSS

      Plaintiffs spend the final twenty-five percent of their
time in the LSS role.  The LSS role includes some clerical
duties and a fair amount of paperwork.  Plaintiffs acknowledged

the LSS role included these duties but maintained that they take a back seat during a contingency and are therefore not the most important aspect of the LSS role.  Mr. Banford testified that his main function as an LSS is to be a point of contact between security and management in the case of a contingency.  ECF No. 189, 83:10-12.  Mr. McGratty testified that when he was in the LSS role during practice drills that he did surveillance and made phone calls to the list of people that had to be informed. ECF No. 190, 72:22-12.  He testified he does not give orders as an LSS because the officers are trained the same way the SSS's are and already know what to do.  ECF No. 190, 73:18-24.

Entergy, on the other hand, once again emphasized the command and control aspects of the LSS role.  A jury could have viewed the LSS's role in a potential contingency as the primary duty of the LSS rather than the day-to-day clerical tasks. However, even if the jury were to conclude that the LSS is a more managerial or administrative role than the CAS/SAS Operators and the FSS, the jurors still could have reasonably concluded that these clerical tasks do not represent the primary duty of the SSS's overall since the Plaintiffs only spend a quarter of their time in this role.

### iv.   Other Testimony Regarding Plaintiff's Primary Duty

Plaintiffs emphasized that their primary duty was not management by highlighting the differences between their duties and the duties of the SOS's who, they argue, actually manage the shift.  For example, various witnesses testified that SOS's and up: make the master schedule (ECF No. 189, 146:10-20), approve vacation requests (ECF No. 189, 157:6-9), discipline direct reports (ECF No. 189, 165:17-22; ECF No. 190, 63:1-3, 210:5-14), issue temporary post orders and compensatory measures when something is broken or out of the ordinary (ECF No. 189, 168:12-169:10; ECF No. 190, 69:14-20), reviews SSS evaluations of SO's on the team and provide guidance if necessary (ECF No. 189, 230:2-4; ECF No. 190, 215:23-216:11), make sure all the team members maintain their qualifications (ECF No. 189, 234:5-7; ECF No. 190, 209:7-16), handle budgeting and drafting policies and procedures (ECF No 189, 167:16-168:8; ECF No. 190, 35:15-21, 64:10-11, 65:1-6), participate in corrective action review groups (ECF No. 190, 37:17-24), handle grievances (ECF No 190, 39:17-18), and spot check the SO's time sheets (ECF No. 190, 208:23-25).  Moreover, SSS's do not grant disability leave, set salaries, make decisions about whether SO's should get a bonus, create job descriptions for SO's, review the scope of their

duties, or provide on-the-job training for SO's.  ECF No. 189,
170:4-23; ECF No. 190, 69:21-22, 70:20-71:5.

        Unlike SOS's the SSS's are armed.  Plaintiffs emphasized
that they are armed in order to act as first responders.
Testimony of various witnesses supported Plaintiffs' theory.
For example, Mr. Banford testified that the SSS's are armed to
fight off intruders and terrorists.  ECF No. 189, 58:5-7.  Mr.
LeClaire testified the purpose of arming up is to provide a
first response to an armed intrusion.  ECF No. 189, 235:4-6.
Mr. Ryan testified that the shift is the first line of defense
for various types of attacks.  ECF No. 190, 29:1-3.  Mr. Wilson
acknowledged that security force members are responsible for
dealing with an armed intrusion and that they are very well-
armed for that reason.  ECF No. 190, 104:19-105:3.  Even Mr.
Patrick agreed that he relies on the SSS to get out there to
deal with contingencies and to "be a first response" to those
situations.  ECF No. 191, 185:21-25.  He agreed that the reason
the SSS have weapons is to meet an intruder with deadly force
even if that is not their main purpose.  ECF No. 191, 190:3-6.

        Defendants, on the other hand, emphasized that the SSS are
supervisors.  Mr. Wilson led the jury through a long list of
activities that the SSS's perform but the SO's do not perform,

suggesting that SSS's are more like SOS's than SO's.[7]  However,

the jury could have reasonably credited the Plaintiffs' theory

that even though some of the SSS's daily tasks might be somewhat

administrative or managerial that their primary duty is actually

some other aspect of their job, such as surveillance or being

prepared to respond in the event of a contingency.  The jury

could have also concluded that these clerical tasks represent

only a minority of how the Plaintiffs spend their time.

The jury did not have to find the Plaintiffs were first

responders to necessarily find that the Plaintiffs were not

---

[7] The list includes: having direct reports; performing annual
evaluations on direct reports; performing monthly one-on-ones
with direct reports; administering job performance measurement
tests; determining if remediation is necessary and if so what
remediation should be instituted for a failure to adequately
perform a test; having the power to certify; having the
authority to order a compensatory post; having the authority to
supervise SO's during the arming and disarming process; having
the authority to assess fitness for duty; having the authority
to coach individuals on positive and deltas and record the same;
having the authority to participate in academic review boards;
having the authority to deal with on-the-job training and task
performance evaluation; administering physical fitness tests;
ordering equipment be tested, ordering searches of vehicles,
packages, materials, and people; being marc trained; performing
duties as alarm station operators and assigning security
officers to respond to alarms; documenting completed controls in
the 24 log and entering them into the matrix; issuing badges and
recording visitors; taking devices off line and initiating
compensatory measures; modifying key card badge access areas;
conducting hourly attentiveness checks; performing background
checks; verifying the eligibility of the SO's every shift;
conducting inventory of security keys and weapons in the armory;
initiating and submitting work orders to repair broken
equipment; verifying and calibrating the explosive detector;
making the post rotation schedule; and directing the security in
force-on-force drills.  ECF No. 190, 136:10-142:6.

exempt, but there was sufficient evidence presented for the jury
to find that the Plaintiffs are first responders.  A reasonable
jury could have inferred that the entire power plant is the
field in which they might respond, especially since some
testimony suggested that there is another secured headquarters
miles away from which security operations are sometimes
directed.  There is simply no case law or regulation mandating
that surveillance must be limited to the security officers
manning stations on the fence line, in towers, or patrolling in
the Bearcat.

### b. Other Elements of the Exemptions

Even assuming *arguendo* that the nature of the Plaintiffs'
primary duty was uncontested, a reasonable jury could have
concluded that Entergy still did not meet its burden of proof on
other aspects of the exemptions.

### i.   Authority to Hire and Fire

First, the jury could have reasonably concluded that the
Plaintiffs did not have the authority to hire or fire other
employees, nor were their suggestions and recommendations with
respect to such decisions given particular weight.

There does not appear to be any dispute that ordinarily
SSS's are not involved in the hiring process.  *See e.g.*, ECF No.
189, 229:14-16; ECF No. 191, 198:13-18.  While there have been a
few occasions during which SSS's were involved in a termination

decision to some extent, the jury could have credited testimony suggesting that Plaintiffs did not actually have the authority required by the regulation.

For example, Mr. Banford testified that he was involved in a review board when one of his direct reports had numerous failures qualifying with firearms. He felt uncomfortable giving an opinion about his direct report's future at Vermont Yankee because he was not a qualified arms instructor. Mr. Banford testified that he felt a lot of pressure to participate. ECF No. 189, 163:15-165:10. When the review board decided to terminate Mr. Banford's direct report he refused to sign the letter terminating his employment. ECF No. 189, 210:6-10. Historically discipline had been handled by Mr. Dagg, an SOS, and this was the first time Mr. Banford had been asked to get involved in this type of matter, well after the lawsuit had been filed. ECF No. 189 218:3-13. The jury might have concluded that this was an exceptional situation that was somehow motivated by the lawsuit rather than the normal course of business.

Mr. McGratty similarly testified that he had no role in hiring, firing, or making disciplinary decisions. ECF No. 190, 62:9-20. He also testified that his SOS would tell him what to do for discipline. ECF No. 190, 63:1-3. If an SO failed a job performance test, Mr. McGratty testified that he would take that

SO off the shift and then call an SOS and Mr. Patrick to see what to do from there.  However, he does not have the authority to decertify the officer.  ECF No. 190, 72:1-7.

Mr. Patrick's testimony supports this view to some extent. He testified that the participants in the meeting that recommended terminating Mr. Banford's direct report did not include any SSS's before the recommendation made its way to the executive review board.  ECF No. 191, 195:13-196:9.  He also testified that the decision to fire another SO was made by folks above Mr. Patrick's pay grade.  ECF No. 191, 197:11-16.

Mr. Parker testified about another SO who was fired named Larry Brouillet.  Mr. Brouillet did not have his required equipment and was decertified and disarmed by another SSS who is not a party to this suit.  ECF No. 191, 79:9-20. However, Mr. Patrick testified that when Mr. Brouillet was terminated that there were no SSS's at the meeting where the initial consensus to fire him was reached.  ECF No. 191, 191:16-194:20.  Mr. Ryan testified that before an employee can be terminated or suspended there needs to be an executive review board and while it is theoretically possible that an SSS could present at one of these that no SSS has ever presented.  ECF No. 190, 46:5-47:5.

Vermont Yankee faces an upcoming reduction in force.  The SSS's, however, have not been directly involved in any decisions about the reduction in force except to participate in drills.

*See* ECF No. 189, 167:12-15; ECF No. 190, 45:4-25, 64:2-4; ECF No. 191, 198:3-12.

In the light most favorable to the Plaintiffs, SSS's do not have the authority to hire or fire other employees nor are their suggestions given particular weight because they are not usually included in the process.  A jury could have viewed Mr. Banford's one-time requested participation as an attempt by Entergy to give the impression his suggestions were given particular weight after the commencement of the lawsuit.

### ii.  Discretion and Independent Judgment

Next, a reasonable jury could have concluded that Plaintiffs did not exercise discretion and independent judgment with respect to matters of significance.  There was a significant disagreement between the parties about the amount of discretion and independent judgment that the SSS's actually had.

Mr. Banford, on the one hand, testified that he has essentially no discretion because every aspect of his job is governed by procedure.  *See, e.g.*, ECF No. 189, 76:21-25 (no discretion in dispatching officers to investigate alarms), 80:13-15 (extensive procedures explain how to address a contingency), 86:9-15 (no discretion in completing paperwork); 90:12-14 (arming up governed by procedure), 105:10-12 (no discretion in checking visitor badges), 110:19-24 (no discretion in how to deploy during contingency), 114:5-9 (checking

29

equipment is proceduralized), 154:20-155:12 (no discretion in following procedure when suspicious item found), 160:22-25 (no discretion in deciding to whom to offer overtime), 172: 3-18 (directing site resources and requesting additional personnel driven by procedure), 192:21-24 (response to armed intrusion driven by procedure).  He also testified that there are disciplinary consequences if he does not follow procedures.  ECF No. 189, 82:22-25.

Mr. McGratty similarly agreed that work at Vermont Yankee is governed by extensive procedures that cover every aspect of what he does.  ECF No. 190, 65:7-21.  He testified that command and control does not involve any independent discretion or judgment.  ECF No. 190, 68:13-18.  Mr. McGratty also testified that in deciding what compensatory measures to put in place he exercises no judgment and that every circumstance he has had for five years has been covered by procedure.  ECF No. 190, 80:5-25.  Finally, Mr. McGratty testified that he has never been asked to depart from procedures in how he might respond to an armed contingency and he has been trained not to depart from it.  ECF No. 191, 204:23-205:4.

Testimony from defense witnesses also supports this theory.  For example, Mr. Ryan testified that he expects the shift to follow procedures.  ECF No. 190, 32:24-33:1.  Mr. Copperthite testified that he would expect that members of the security

shift would follow procedures on a regular and customary basis.
ECF No. 191, 35:23-25.  Even Mr. Wilson's testimony suggested
that the idea behind extensive training is to "instill the
knowledge of the procedures without being able to refer to
them," implying that procedures actually do constrain the SSS's
behavior during a contingency even if there is not enough time
to refer to them.  ECF No. 190, 93:8-15.

Plaintiffs also presented evidence that during the event
that came closest to a real contingency at Vermont Yankee-an
incident in which a suspicious object was found-one of the
critiques of the investigation that followed was that no one
bothered to check the procedure to determine the appropriate
steps the individuals involved should have taken.  ECF No. 190,
50:13-16; ECF No. 191, 38:7-10.

Entergy obviously attempted to discredit the notion that
the SSS's duties do not involve any discretion and several
witnesses testified that SSS's actually do use some independent
judgment.  However, there was ample evidence for the jury to
find the opposite.  It was up to the jury to determine whether
the testimony about the Plaintiffs' relative discretion or lack
of discretion was credible in light of all the evidence
presented.  Entergy cannot demonstrate that a reasonable jury
could reach only one conclusion.  Therefore judgment as a matter
of law on this issue is not warranted.

## III. Entergy's Motion for a New Trial

### A. Legal Standard

In the alternative to its motion for judgment as a matter of law, Entergy argues the Court should order a new trial pursuant to Federal Rule of Civil Procedure 59.  A district court may grant a motion for a new trial if it concludes that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice.  *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003).  A new trial may be granted even if there is substantial evidence supporting the jury's verdict.  *Id.*  Moreover, unlike when deciding whether to grant a Rule 50 motion, courts are free to weigh the evidence and examine it through their "own eyes."  *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 147 (2d Cir. 2001).  The Court also need not view the evidence in the light most favorable to the verdict winner.  *Id.*

However, Second Circuit "precedent counsels that trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility and may not freely substitute his or her assessment of the credibility of the witnesses for that of the jury simply because the judge disagrees with the jury."  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) (internal citations and quotations omitted).  Jury verdicts should be disturbed with

32

great infrequency. *Id.* Moreover, it is "well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple' . . . ." *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998).

**B. Discussion**

Entergy raises several arguments as to why a new trial is warranted in this case.  The Court addresses each in turn with this standard in mind.

### 1.  The Weight of the Evidence

Entergy argues that the jury's decisions that the FWW damages model does not apply and that Entergy acted willfully are contradicted by or lacking any support in the evidence. Therefore, the jury's verdict is seriously erroneous. Similarly, Entergy argues Plaintiff's claim that they were exempt first responders rested on arguments that were wrong as a matter of law.

Plaintiffs argue that Entergy is asking the Court to simply reach a different conclusion than the jury.  The parties presented conflicting evidence about the questions the jury was asked to answer.  It was up to the jury therefore to determine whose account was credible.  Even when weighing the evidence here, the Court does not conclude that the jury reached a seriously erroneous result or that the verdict was a miscarriage

of justice.  The evidence presented was sufficient to sustain
the jury's verdict and the Court finds no reason to disturb the
jury's credibility determinations in this case by ordering a new
trial.

### 2.  Jury Charge

"A jury instruction is erroneous if it misleads the jury as
to the correct legal standard or does not adequately inform the
jury on the law." *Bank of China v. NBM LLC*, 359 F.3d 171, 176
(2d Cir. 2004) (internal quotation omitted).  An instruction
must allow the jury to adequately assess evidence on which a
party relied.  *Id.*  When jury instructions, taken as a whole,
give the jury a misleading impression or an inadequate
understanding of the law, a new trial is warranted.  *Plagianos
v. Am. Airlines, Inc.*, 912 F.2d 57, 59 (2d Cir. 1990).  An
erroneous instruction requires a new trial unless the error is
harmless, meaning the error did not influence the jury's
verdict.  *Bank of China*, 359 F.3d at 176.  The jury charge is
adequate, however, when taken as a whole it is correct and
sufficiently covers the case so that a jury can intelligently
determine the questions presented to it.  *Hathaway v. Coughlin,*
99 F.3d 550, 552 (2d Cir. 1996).

As an initial matter, the Court notes that it took great
care in drafting the jury charge in this case.  First, the Court
prepared a draft of the charge that attempted to incorporate

language requested by both sides while simultaneously
recognizing that if every suggestion were adopted it would be
extremely lengthy and likely confusing.  The Court also looked
at Sand's Modern Federal Jury Instructions as a guide to help
streamline and summarize some of the longer and more cumbersome
suggestions.  The Court excluded language that was superfluous
or obvious and generally sought to avoid including any
instruction that might suggest to the jury how it should view
the evidence one way or another.  The Court also excluded some
arguments that could be made in summation in order to avoid
putting the Court in the role of advocate for either side's
theory of the case.

The parties received the draft at the end of the third day
of the trial and the Court held a charge conference at the
beginning of the fourth day.  The Court considered objections
from both sides and ultimately granted many of the parties'

requests to change particular language.[8]  Entergy now renews

several objections it made during the charge conference in its

motion for a new trial.

### a. Entergy's Burden Regarding the Exemptions

First, Entergy objects to the Court's inclusion of the

phrase "plainly and unmistakably" in its charge and argues that

this language elevated its burden of proof above a preponderance

of the evidence with respect to the exemptions.  A party's

evidentiary burden describes, in essence, the *quantity* of

evidence that a proponent is required to present in order to

---

[8] The Court agreed to: 1) change the phrase "eligible employees"
to "non-exempt employees" in the general description of the
FLSA, 2) delete a sentence about how overtime pay usually works
in the general description of overtime, 3) delete a sentence
describing the exemptions as "narrowly construed against
Entergy," 4) delete a sentence stating if the record is unclear
as to an exemption, Entergy will have failed to satisfy its
burden, 5) clarify that the executive exemption applies if the
Plaintiff's suggestions and recommendations as to hiring,
firing, advancement, promotion or other changes of status of
other employees are given particular weight, 6) add an
instruction defining the phrase "department or subdivision," 7)
add an instruction delimiting factors to consider when
determining whether employee's suggestions and recommendations
are given "particular weight," 8) add a sentence clarifying that
work that is directly and closely related to the performance of
management work is also considered exempt work, 9) add the
phrase "or non-manual" to describe the administrative exemption,
10) explain that the same considerations regarding primary duty
in the executive exemption also apply to the administrative
exemption, 11) explain that an employee's decisions need not be
final nor their authority unlimited and the fact that decisions
are subject to review does not defeat a finding of discretion
and independent judgment, and 12) change the word "may" to
"should" in a description of the combination exemption.  *See* ECF
No. 192, 3:2-38:4.

prevail on an issue.  To prove something by a preponderance of the evidence, the proponent must introduce a quantum of proof sufficient to push the factfinder over the line from less likely or equally likely to more likely than not.  The "plainly and unmistakably" rule, on the other hand, is an essential part of the applicable legal standard that describes the *quality* of the evidence that is required to find an employee is exempt.  It describes the kinds of things that the exemptions cover.  The jury must consider both the quantity and quality of evidence when evaluating it and must therefore be instructed on both concepts.  However, including an instruction about how to understand what quality of evidence should persuade the jury does not affect the employer's burden with respect to the quantity of evidence it is required to introduce.

The Court clearly instructed the jury that Entergy's evidentiary burden was a preponderance of the evidence.  The Court first discussed the nature of the preponderance standard with the jury during the *voir dire* process and in its preliminary instructions.  In its charge, the Court refers to the preponderance standard several times.  First, in a section describing the difference between direct and circumstantial evidence, the Court explained that "the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts in accordance with the preponderance of

all the evidence in the case, both direct and circumstantial."
ECF No. 181 at 5.  Next, the Court included an extensive
description of the preponderance standard in a general section
entitled "Burden of Proof," including language stating, "To
prove something by a preponderance of the evidence means to
prove that something is more likely true than not true.  A
preponderance of the evidence means the greater weight, or
logic, or persuasive force of the evidence."  ECF No. 181 at 7.
Finally, the Court reminded the jury about the preponderance
standard either immediately before or immediately after the two
instances it referred to the "plainly and unmistakably" rule in
its charge.  Taken as a whole, the charge is clear that the
evidentiary burden is at all times the preponderance of the
evidence and that the quantity of evidence required was only
enough to make that fact more likely true than not.

        If the Court had not included the plainly and unmistakably
language, its instruction would have given the jury only half of
the understanding required to make an intelligent decision as to
whether Entergy properly characterized the Plaintiffs as exempt.
The Supreme Court has "held that [FLSA] exemptions are to be
narrowly construed against the employers seeking to assert them
and their application limited to those establishments *plainly
and unmistakably* within their terms and spirit."  *Arnold v. Ben
Kanowsky, Inc.*, 361 U.S. 388, 392 (1960) (emphasis added); *see*

*also Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012); *Bilyou v. Duchess Beer Distributors, Inc.*, 300 F.3d 217, 222 (2d Cir. 2002). The "plainly and unmistakably" language finds its origins in *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945). There the Court noted that the FLSA was "designed to extend the frontiers of social progress by insuring all our able-bodied working men and women a fair day's pay for a fair day's work." *Id.* (internal quotation omitted). Exemptions from such "humanitarian and remedial legislation" must therefore be narrowly construed. *Id.* To extend an exemption "other than [to] those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people." *Id.*

The Second Circuit has described the "exemption question" as a mixed question of law and fact with essentially two components. *Ramos*, 687 F.3d at 558. The question of how employees spend their time is a question of fact, while the question of whether their particular activities excluded them from overtime benefits of the FLSA is a question of law. *Id.* In addressing this second aspect of the question, the exemptions must be "narrowly construed" and the employer bears the burden of proving its employees fall within an exempted category of the FLSA. *Id.; see also Meza v. Intelligent Mexican Marketing*, 720 F.3d 577, 581 (5th Cir. 2013) ("The employer must prove facts by

a preponderance of the evidence that show the exemption is 'plainly and unmistakably' applicable."); *Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 926 (10th Cir. 2012)  ("It is the employer's burden to prove that an employee falls 'plainly and unmistakably' within a FLSA exemption."); *Cleveland v. City of Los Angeles*, 420 F.3d 981, 988 (9th Cir. 2005) ("[T]he [employer] has the burden to prove that Plaintiffs meet each element of the § 207(k) exemption . . . and that Plaintiffs fit 'plainly and unmistakably' within the terms and spirit of the exemption."); *Spinden v. GS Roofing Products Co.*, 94 F.3d 421, 426 (8th Cir. 1996) ("The burden is on the employer to prove that this exemption applies by demonstrat[ing] that their employees fit plainly and unmistakably within the exemption's terms and spirit.") (internal quotation omitted)); *Friedrich v. U.S. Computer Services*, 974 F.2d 409, 412 (3d Cir. 1992) ("It is the employer's burden to affirmatively prove that its employees come within the scope of the overtime exemption, and any exemption from the Act must be proven plainly and unmistakably.").

In dicta the Supreme Court has described its "plainly and unmistakably" rule as one "governing judicial interpretation of statutes and regulations." *Auer v. Robbins*, 519 U.S. 452, 462-63 (1997).  Indeed, the vast majority of decisions in which courts refer to the rule come from motions for summary judgment

or bench trials.  In this case, however, it was the jury that decided the ultimate exemption question.  There are relatively few cases describing how a jury, rather than a court, should be instructed to evaluate whether employees are exempt.

The Second Circuit has noted, however, that mixed questions of law and fact, common to FLSA claims, "are especially well-suited for jury determination."  *Ling Nan Zheng v. Liberty Apparel Co.*, 617 F.3d 182, 185 (2d Cir. 2010) (internal quotation omitted).  A recent Supreme Court case confirms that it is appropriate to submit mixed questions to juries.  *See Hana Financial, Inc. v. Hana Bank*, 135 S. Ct. 907 (2015).  ("[T]he application-of-legal-standard-to-fact sort of question . . ., commonly called a 'mixed question of law and fact,' has typically been resolved by juries." (quoting *United States v. Gaudin*, 515 U.S. 506, 512 (1995)).  Although juries are factfinders, "the jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion . . . ."  *Gaudin*, 515 U.S. at 514.  A mixed question may be submitted to the jury only if the jury is instructed to the applicable legal standards. *Simms v. Village of Albion, N.Y.*, 115 F.3d 1098, 1110 (2d Cir. 1997).

The "plainly and unmistakably" language is an essential part of the applicable legal standard that courts deciding the

41

exemption question are required to consider in order to effectuate congressional intent.  A jury must be properly instructed to do the same because this language is consistent with Congress's remedial and humanitarian purpose in enacting the FLSA.  Omitting this language from the charge would have resulted in a failure to instruct the jury on relevant and binding law.

Entergy contends that the "law questions" were answered by the Court's instructions to the jury so the "plainly and unmistakably" canon of construction should not have been used for the jury's determination of the "fact question."   ECF No. 200 at 20.  Thus, according to Entergy, the "plainly and unmistakably" language should not have been included in the charge at all.  Entergy's argument is undermined by the case law and is belied by Entergy's requested instruction.  The "fact question" as its described in *Ramos* would only require the jury to answer how the employees spent their time.  Neither Entergy nor the Plaintiffs requested that the jury only determine how the Plaintiffs spent their time.  Rather both parties requested instructions on all of the elements of each exemption.  The mixed question here is not easily separated into its component parts because each element of the exemption requires the jury to resolve some sort of factual dispute (for example, the nature of the employee's primary duty).  The jurors necessarily decided

both aspects of the question in rendering their verdict and so they were required to consider both the quantity and quality of Entergy's evidence just as a court would in the same position.

*Lederman v. Frontier Fire Protection, Inc.*, 685 F.3d 1151 (10th Cir. 2012) is not dispositive here because the trial court's erroneous instruction in *Lederman* is distinguishable, as is the *Lederman* court's description of the exemption question. In *Lederman* the trial court instructed the jury that an "employer seeking an exemption from the overtime requirements of the FLSA *bears the burden* of proving that the particular employee fits plainly and unmistakably within the terms of the claimed exemption." *Id.* at 1154 (emphasis added). The trial court left jurors with the impression that the defendant's burden in terms of quantity was not, therefore, a preponderance of the evidence. In reversing the trial court, the Tenth Circuit found it relevant that the instruction "spoke explicitly in terms of the burden of proof." *Id.* at 1159.

In this case the Court did not instruct the jury to consider the evidence under a higher burden than the preponderance of the evidence standard. *Id.* at 1158-59. The two sentences in which the phrase "plainly and unmistakably" appears in the charge do not contain the word burden. Moreover, the charge states Entergy "must prove that one or more of the exemptions apply by a preponderance of the evidence." ECF No.

43

181 at 10.

*Lederman* is also distinguishable because the Tenth Circuit did not describe the exemption question as a mixed question of law and fact in the same terms that the Second Circuit has. Rather, it states that "[o]nce a court finds the employer is eligible to claim the exemption, the factfinder reviews the disputed facts to determine if the exemption is met." *Id.* at 1158. This is subtly different from the two aspects of the exemption question the Second Circuit described in *Ramos*. Even though *Lederman* is ostensibly describing the legal standard in the context of jury instructions, this language seems to suggest a Court would first evaluate the exemption as a matter of law in the summary judgment context.

The *Lederman* court seemed primarily concerned with addressing an apparent inconsistency in Tenth Circuit case law and resolving once and for all that the evidentiary burden of proof is a preponderance of the evidence, not "clear and affirmative evidence." *Id.* This Court is in perfect agreement with the *Lederman* court on that point. *Lederman* does not, however, explain what a proper instruction would have been, only that the instruction as given left the jury with a misleading impression. The Court's charge properly instructed the jury on the two aspects of the exemption question without improperly elevating Entergy's burden of proof.

44

At least one other district court in this circuit has given
a similar instruction when applying Second Circuit precedent.
The *Perkins* court noted that the defendant only had the burden
of proving the exemptions applied by a preponderance of the
evidence.  However, "[i]n recognition that the exemptions are
meant to be construed narrowly, as instructed by the Supreme
Court and the Court of Appeals for the Second Circuit, the court
incorporated the 'plainly and unmistakably' language into its
instructions to the jury."  *Perkins v. So. New England Telephone
Co.,* No. 3:07-CV-967 JCH, 2012 WL 517286, at *4 (D. Conn. Feb.
14, 2012).[9]  The *Perkins* court's charge instructed:

> You should consider the exemptions from overtime that SNET
> asserts as narrow exemptions from the presumption that
> plaintiffs are entitled to overtime compensation.  That is,
> these exemptions are limited to employment positions which
> plainly and unmistakably come within the terms and spirit
> of the federal and state law.  If you find that SNET has
> not proven that the plaintiffs fall within the specific
> terms of the exemption as I describe them, you must find
> that Plaintiffs are entitled to overtime compensation.  If,
> however, you find that SNET has overcome this presumption
> and proven that the plaintiffs fall within the specific
> terms of the exemption as I describe them, you must find
> that the plaintiffs are not entitled to overtime
> compensation.

ECF No. 209-1 at 25.  The *Perkins* court did not refer to the
preponderance burden in this section of the charge, although it
did in other sections of the charge discussing the exemptions.

---

[9] The case ultimately settled so the Second Circuit never
reviewed this instruction.

If the Court had deleted the phrase "plainly and unmistakably" as Entergy requested, the Plaintiffs would have been prejudiced by an incomplete statement of the law.  The Court's instruction appropriately incorporated the two concepts of quantity and quality.  Therefore a new trial is not warranted on the basis of this instruction.

### b. Fluctuating Workweek Model

Next, Entergy argues that the Court's instructions on the FWW model failed to adequately instruct the jury on aspects of the law that were relevant based on the evidence, namely 1) that there need not be an express or written agreement, 2) an agreement may be implied by the parties' course of conduct, and 3) that the Plaintiff's subjective beliefs about the hourly requirements were not determinative.

Entergy proposed the following language be added to the charge:

> The parties' understanding need not be written or even explicit, and the Plaintiff's subjective beliefs about what his position might entail are not determinative; rather, the parties conduct is sufficient and you may find such an understanding if the evidence shows that Plaintiff clearly knew his salary remained the same each workweek, but was required to work differing hours each week.

ECF No. 200-1 at 13. Instead the Court instructed the jury: "In evaluating what the understanding between the parties was you [may] take all factors into account, both explicit and implicit."  ECF No. 181 at 21.

Generally the Court avoided commenting on the evidence in a way that seemed to suggest that the jury should reach one result or another.  Entergy's proposed instruction put too much emphasis on the possibility of finding an implied agreement and would have been unfair to the Plaintiffs because it might have suggested that the Court believed that there was an implied agreement.  The Court's instruction was sufficient to instruct the jury that it could consider whether an implied agreement existed and Entergy was free to argue that such an agreement did exist in its summation.  That counsel for Entergy did not specifically argue that the facts supported finding an implied agreement is no fault of the Court's instruction.

### c. Willfulness

Entergy argues that language in the instruction on willfulness permitted the jury to find Entergy acted willfully under a negligence standard rather than the higher standard the law requires.  The Court's instruction on willfulness came right from Sand's Modern Federal Jury Instructions and is entirely consistent with federal law.  *See, e.g.*, *Pollis v. New School for Social Research*, 132 F.3d 115, 119 (2d Cir. 1997) (noting that a violation is willful if the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute").  Entergy now argues language referring to failures to act permitted the jury "to adopt

47

Plaintiffs' negligence theory." ECF No. 200 at 23. However, Entergy did not object to the instruction's reference to failures to act during the charge conference, so any argument regarding this specific language is waived.

Entergy did request that the Court add the following language to its instruction on willfulness: "An employer does not act willfully if it makes a mistake, or is negligent, in its determination that an employee is exempt from the overtime laws. Put differently, a finding that Entergy should have known of the Plaintiff's exempt status is not sufficient for a willfulness finding." ECF No. 200-1 at 14. This language was not necessary to enable the jury to adequately understand the question it was being asked to answer and would have put undue emphasis on Entergy's theory of the case. The Court's instruction was entirely appropriate.

### d. First Responder

Entergy raises several arguments as to why the Court's instruction on the Department of Labor's first responder regulation was inadequate. The Court notes at the outset that this was a highly contested area of law and that crafting a balanced and accurate instruction would necessarily mean that neither side would get the exact language it requested.

A significant portion of the language in the charge came from the first responder regulation itself. The Court included

48

the list of examples of first responder activities from 29
C.F.R. § 541.3(b)(1).  Other language in the charge came
directly from descriptions in *Mullins v. City of New York*, the
most thorough opinion on the regulation from the Second Circuit.
653 F.3d 104 (2d Cir. 2011).  For example, the charge states
"individuals performing first responder functions are not exempt
under the administrative or executive exemption even if they
also direct the work of other employees in the conduct of such
'first responder' duties."  ECF No. 181 at 19.  *Mullins*
similarly states that the Secretary of Labor (whose opinion
regarding the regulation the court adopted) stated that "field
law enforcement work does not become management simply because
the police officer 'directs the work of other employees' while
performing this work."  653 F.3d at 115.  Likewise, the Charge
instructs, "Certain managerial tasks such as directing
operations at a crime, fire, or accident scene when performed by
high-level personnel who typically do not engage in front-line
activities would still be considered management."  ECF No. 181
at 19.  This is nearly a direct quote from *Mullins*.  653 F.3d at
116.

*Mullins* also makes clear that the first responder
regulation is still concerned with understanding what the
employee's primary duty is.  653 F.3d at 115 ("The Secretary
does not, as a result, eliminate the primary duties test.").

The Court therefore instructed the jury that the determining factor was the employee's primary duty "based on the totality of the circumstances."  ECF No. 181 at 19; *see also* 29 C.F.R. § 541.700 ("Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.").

*Mullins* also suggests that a potential distinction between work done in the field and work done remotely is a factor to consider in determining whether an individual's primary duty is indeed management or other exempt work.  *Compare* 653 F.3d at 114 ("[T]he example provided in section 541.3(b)(2) simply illustrates the first responder regulation's essential principle: the performance of non-exempt *field* law enforcement work that involves supervision of other officers does not transform that non-exempt work into exempt management.") (emphasis added) *with id.* at 115 ("[C]ertain managerial tasks such as 'directing operations at crime, fire, or accident scenes' when performed by high-level personnel who *typically did not* engage in any *front-line* activities would still be considered 'management.'") (emphasis added).  The Court thus instructed the jurors that they could consider the location where an employee performs his duties as an important factor but as one of many circumstances that they may take into account. ECF No. 181 at 20.  However, that such activities occur "in the

field" is not the dispositive element.  653 F.3d at 115.  The
Court therefore instructed the jury not to decide on that basis
alone.

Entergy argues that the court should have defined "legal
terms of art" such as "first response," "surveillance," and
"investigate" rather than let the jury use a colloquial
definition.  ECF No. 200 at 25-36.  However, the authorities
Entergy previously cited and now cites in its motion to support
its definitions come largely from the summary judgment context,
which are necessarily fact-dependent.  Neither the regulations
nor binding case law provides definitions for any of these
terms, nor is there any authority suggesting that colloquial
understanding of these words is inappropriate or inconsistent
with the meaning of the regulation.

With respect to Entergy's requested instruction regarding
"surveillance" in particular, if the Court had adopted Entergy's
definition it would have significantly undermined the
Plaintiffs' case.  Moreover, such an instruction was not
warranted based on existing case law.  Entergy asked the Court
to add the following language: "It is also important to note
that the term 'performing surveillance' refers to field
operations by law enforcement personnel in which they, alone or
in cooperation with others, go into the field to observe
criminal activity."  ECF No. 200-1 at 13.  Entergy's argument

that this is the "only interpretation of surveillance consistent

with the plain language of the regulation" is simply

unpersuasive.  ECF No. 200 at 13.  The regulation itself does

not define surveillance and there is no evidence that a

colloquial meaning would be inconsistent with the Department of

Labor's intent.

### e. Highly-Regulated Workplace

Finally, Entergy argues the Court did not give the jury

adequate legal tools to weigh the credibility of Plaintiffs'

testimony that in any situation, even in an active armed attack,

that they would read or refer to a dense procedure document to

determine their actions.

The Court instructed the jury:

> The overtime exemptions are not available for employees who
> simply apply well-established techniques or procedures
> described in manuals or other sources to determine the
> correct response to an inquiry or set of circumstances.
> However, reliance upon manuals, does not, in itself,
> preclude exemption.  An employee may be exempt even if his
> discretion is circumscribed by a manual as long as that
> employee makes independent judgments.

ECF No. 181 at 10.

Entergy requested that the Court include the following

language:

> The fact that Entergy's operations at Vermont Yankee,
> including its security operations, are heavily regulated by
> the federal Nuclear Regulatory Commission should not alone
> cause you to find Plaintiffs did not exercise discretion
> and independent judgment as to matters of significance.
> Many industries and employers are subject to extensive

governmental regulations and rules that channel and
constrain the conduct of employees in those industries.
The question for you to answer is not the extent of
regulation that applies to Entergy's Vermont Yankee
Security Operations but, instead, you must determine
whether the Plaintiffs exercise discretion and independent
judgment.  Even in a highly regulated workplace, an
employee may exercise discretion and independent judgment
if they make independent choices and have discretion to
take actions within the scope permitted by the regulations,
exercise discretion in applying those regulations as part
of their duties, or make independent choices and exercise
discretion to address situations and issues that arise that
are not specifically addressed by the regulations.  In
addition, in evaluating whether an employee's exercise of
independent judgment and discretion relates to matters of
significance, you may consider that compliance with
governmental safety and security regulations is important
for companies in the nuclear industry and the public."

This language was not necessary to properly instruct the
jury and advocated too strongly for the Defendant's theory of
the case.  As described above there was a substantial conflict
in the testimony about the SSS's discretion and Entergy concedes
that "it was up to the jury to weigh the credibility of that
assertion."  ECF No. 200 at 26.  The language Entergy requested
above fell outside the regulatory definitions and
interpretations of the administrative exemption.  The cases
Entergy cited to support its request did not require the Court
to adopt this precise language.

### 3. Evidence Regarding Wackenhut

Entergy moved *in limine* to preclude the Plaintiffs from
offering any evidence or argument concerning their duties and
non-exempt classification at Wackenhut.  The Court stated at a

53

motions hearing that it would allow Plaintiffs to present evidence about their own employment and compensation at Wackenhut only for purposes of demonstrating their understanding and state of mind upon being hired at Entergy.  ECF No. 194 at 36-37.  Entergy argues that the Plaintiffs crossed the "delicate line" the Court set out in its pre-trial ruling because they were permitted to argue and offer evidence that Entergy should have treated Plaintiffs as exempt because Wackenhut had.

Entergy waived any objections that it did not raise at trial.  Of the testimony Entergy now claims was improper, it objected in only a few places during the trial.  First, Entergy claims it was improper that Mr. Banford testified that roles he performed at Wackenhut were the same as the SSS role at Entergy, that employees in those roles were paid hourly, and that Entergy knew of that pay structure.  However, counsel for Entergy only objected when Mr. Banford was asked how much he earned at Wackenhut.  The Court overruled the objection.  The amount Mr. Banford was previously paid was relevant to his state of mind in evaluating his compensation at Entergy.

Second, Mr. Dagg testified that he was previously a Security Officer at Wackenhut and he worked at both CAS and SAS for Wackenhut.  Entergy objected when counsel for Plaintiffs asked Mr. Dagg whether CAS/SAS is now done exclusively by SSS's. The Court admonished counsel not to go too far but permitted

this question about who performs CAS/SAS now.  Counsel did not ask Mr. Dagg about how he was paid at Wackenhut or whether he was exempt or non-exempt.  This single question about which employees perform CAS/SAS now does not suggest that the positions are necessarily equivalent nor does it cross the line the Court had envisioned.  The questions that follow are about the amount of time each SSS performs CAS/SAS functions.

Third, Entergy objected when Mr. Spitzfaden was asked if former Wackenhut workers were switched from nonexempt union positions to exempt nonunion positions when the security force went in house.  The Court overruled the objection because this question went to the heart of Plaintiffs' willfulness theory. It was highly relevant whether Mr. Spitzfaden, as the person in charge of FLSA compliance, knew whether the employees were moving from non-exempt to exempt status.  This evidence was not offered to prove Wackenhut's non-exempt classification was correct.

Finally, Entergy objected when Counsel for Plaintiffs asked Mr. Patrick whether Wackenhut employees were being paid overtime, which the Court sustained.  There is no reason to think that sustaining Entergy's objection before Mr. Patrick answered caused Entergy any prejudice.

All of the Court's rulings conformed with its pre-trial ruling on Entergy's motion *in limine* and were consistent with

the Court's broad discretion in choosing whether to admit evidence.

None of Entergy's arguments have persuaded the Court that a new trial is warranted here.  Accordingly, Entergy's motion for a new trial is **denied.**

## IV. Plaintiffs' Motion for a Judgment Order Incorporating the Jury Verdict

### A. Legal Standard

Since the Court will deny Entergy's motions for the reasons stated above, the only question remaining is whether Plaintiffs are entitled to liquidated damages pursuant to 29 U.S.C. § 216(b).  A district court is generally required to award liquidated damages equal in amount to actual damages.  *Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132, 151 (2d Cir. 2008).  Double damages are the norm and single damages are the exception.  *Id.*  However, courts retain discretion to deny liquidated damages where the employer shows that, despite its failure to pay appropriate wages, it acted in subjective "'good faith'" with objectively "'reasonable grounds'" for believing that its acts or omissions did not violate the FLSA. *Id.* (quoting 29 U.S.C. § 260).

To establish subjective good faith, an employer must show that it took "active steps to ascertain the dictates of the FLSA and then act to comply with them."  *Id.* (quoting *Herman v. RSR*

*Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)).  The Second Circuit has described the employer's burden in meeting this standard as a "heavy" one.  *Id.*

**B. Discussion**

As discussed above, the jury reasonably found that Entergy's violation of the FLSA was willful, meaning Entergy showed reckless disregard for the matter of whether its conduct was prohibited by the statute.  Opinions from other district courts in this circuit suggest a finding of willfulness necessitates finding a corresponding lack of good faith.  For example, in *Yu Y. Ho v. Sim Enterprises, Inc.*, No. 11 Civ. 2855(PKC), 2014 WL 1998237, at *17 (S.D.N.Y. May 14, 2014) the court noted that although the defendants did not attempt to establish good faith, that even if they had they would have been unsuccessful because their violations were willful.  Likewise, in *Lanzetta v. Florio's Enterprises, Inc.*, No. 08 Civ. 6181(DC), 2011 WL 3209521, at *6 (S.D.N.Y. July 27, 2011) the court stated that "once the employer's willfulness has been established . . . the FLSA seem[s] to require that a plaintiff be awarded liquidated damages."

One district court even suggests that the Second Circuit has "squarely held" that a district court may not find good faith after a jury has concluded that the employer willfully violated the FLSA.  *Scott v. City of New York*, No. 02 Civ.

57

9530(SAS), 2009 WL 1138719 (S.D.N.Y. April 27, 2009).  However, the case the *Scott* court cites, *Pollis v. New School for Social Research*, 132 F.3d 115 (2d Cir. 1997), merely states that the evidence was sufficient to support the jury's finding of a reckless or willful violation and that the resulting compensatory award should be doubled pursuant to the FLSA's liquidated damages provision.

It is unclear from the *Pollis* opinion whether the court's statement applies to *all* willful violations or simply to the willful violation in that case.  However, the court does cite two other opinions with approval that suggest that courts are bound to award liquidated damages when the jury finds the violation was willful.  *See Brinkman v. Dep't of Corr. of State of Kan.*, 21 F.3d 370, 373 (10th Cir. 1994) ("The same willfulness standard for the statute of limitations issue applies to the liquidated damages issue . . . ."); *EEOC v. City of Detroit Health Dep't, Herman Kiefer Complex*, 920 F.2d 355, 358 (6th Cir. 1990) ("Since the jury determined that the City's violation of the Equal Pay Act was willful, and since the district court was, in determining whether the violation was in good faith and with reasonable grounds, presented with the same

issue, the district court was bound by the jury finding.")[10]   The
Court feels obligated to follow suit and hold that a finding of
willfulness necessitates an award of liquidated damages.

Even if the Court were not bound to find a lack of good
faith based on the jury's finding of willfulness, liquidated
damages are nevertheless appropriate here.  Similar to the
defendants in *Reich v. Southern New England Telecommunications*,
121 F.3d 58 (2d Cir. 1997) and *Barfield v. New York City Health
and Hospitals Corp.*, 537 F.3d 132 (2d Cir. 2008), Entergy took
no active steps to ascertain the dictates of the FLSA in this
case.  *Barfield*, 537 F.3d at 150 (explaining that "good faith"
requires an employer first take active steps to ascertain the
dictates of the FLSA and then move to comply with them); *Reich*,
121 F.3d at 71 (same).  Entergy cited nothing in the record,
much less proffered that it attempted to ascertain the dictates
of the FLSA with respect to the SSS's exemption
characterization.  The only testimony from anyone responsible
for ensuring compliance with the FLSA was Mr. Spitzfaden's
testimony.  He stated no one asked him to analyze whether a
conversion of the workers would be appropriate.  Nor did Mr.
Spitzfaden undertake such an analysis unprompted of his own

---

[10] In its opposition to the Plaintiffs' motion, Entergy does not
cite any legal authority demonstrating a court is permitted to
find good faith when the jury properly found the violation was
willful.

accord.  Entergy may not have intentionally violated the FLSA and may have honestly believed its employees were exempt but there is no evidence it took any steps at all to see that its characterization was appropriate.  Therefore even if the Court were not obligated to find a lack of good faith when faced with the jury's willfulness finding, it would nevertheless find a lack of good faith here.

### Conclusion

The Court **grants** Entergy's motion for judgment as a matter of law on the fluctuating workweek issue with respect to Plaintiffs Miller and Stratton only.  The Court **denies** Entergy's motion for judgment as matter of law in all other respects and **denies** Entergy's motion for a new trial.  Accordingly, the Court **denies** Plaintiffs' motion with respect to Plaintiffs Miller and Stratton on the FWW issue but **grants** Plaintiffs' motion for judgment incorporating the jury verdict in all other respects.

The Court orders the parties to recalculate Mr. Miller and Mr. Stratton's damages using the FWW method and to submit that revised calculation to the Court within 14 days of the date of this Opinion and Order.

Dated at Burlington, in the District of Vermont, this 11th day of February, 2015.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge